Gregg Roberts
43430 E Florida Ave F-293
Hemet CA 92544
951-350-5371
gregg@legalsupport-sc.com
Assignee of Record and Judgment Creditor, Pro Se

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re Armen Davidian,<br>Debtor<br>Gregg Roberts,<br>Assignee of Record and Judgment Creditor,<br>v.<br>Armen Davidian,<br>Debtor / Defendant | AP Case #1:25-ap-01080-MB<br>Chapter 7<br>Main Case #1:25-bk-11688-MB<br><br>**DECLARATION OF GREGG ROBERTS**<br><br>Hearing Date/Time: Tues, Oct. 13, 2026, 2:30 PM<br>Location: 21041 Burbank Blvd, Courtroom 303, Woodland Hills, CA 91367<br>(See separately filed and served Supplemental Notice regarding ZoomGov remote appearance.)<br>Judge: Hon. Martin Barash |

I, Gregg Roberts, declare:

1. I am Plaintiff, the assignee of record, judgment creditor, and real party in interest. I have personal knowledge of the procedural facts stated here and could testify competently to them.

2. I filed a timely objection to Davidian's claimed homestead exemption on November 7, 2025. The objection expressly invoked 11 U.S.C. § 522(o), alleged that ill-gotten gains were placed

into the homestead during the statutory ten-year period with the requisite intent, and asked that overlapping issues be coordinated with this adversary proceeding. A true copy is Exhibit 3.

3. The Court has coordinated hearings on the exemption objection with status conferences in this adversary proceeding. I recall the Court stating that the exemption objection would be decided through the adversary proceeding. The written tentative rulings that I located document the coordinated hearings; I do not represent that they independently reproduce the full oral statement.

4. I caused Davidian to be served with written discovery concerning the March 2019 financing, disposition of funds, Property expenditures, and Stepanyan deed of trust. My Requests for Admission, Interrogatories, and Requests for Production, followed by Davidian's complete three-page combined purported response document received in July 2026, are included in Exhibit 4.

5. Before receiving Davidian's discovery responses, I had known of the recorded Stepanyan deed of trust and had alleged facts casting doubt upon it in the First Amended Complaint. I had not yet sought affirmative relief determining the lien. That was because I expected that Davidian, as the alleged borrower and the person who executed and recorded the deed, would produce documents substantiating the existence and amount of the underlying obligation. I further wished to observe the rule against needlessly expanding the litigation by joining an unnecessary defendant. Had the requested documents substantiated the obligation, I would have left the lien undisturbed. Davidian instead stated that no supporting documents exist other than the deed itself, and he described the alleged advances as primarily undocumented

cash, with occasional checks, furnished between 2009 and 2012. I now seek to join Stepanyan so that she may produce whatever supporting evidence she possesses and be heard before the Court adjudicates the apparent interest evidenced by the deed.

6. The responses were unsigned, the interrogatory answers were not verified under oath, and numerous substantive answers were evasive or incomplete. Davidian's separate 33-page production contained no records substantiating the alleged Stepanyan obligation.

7. On July 31, 2026, I emailed Davidian and Sevan Gorginian a detailed request for a telephonic conference under LBR 7026-1(c), identified the deficiencies by request number, and requested that they be cured. The complete email request is reproduced in Exhibits 6 and 7.

8. At 7:31 p.m. on July 31, 2026, Gorginian stated that he did not represent Davidian in this adversary proceeding and expressly stated: "I'll send you the Wells Fargo statements that we gave to Swift. You may already have them." That message is included in Exhibit 6.

9. On August 1, 2026, I emailed Davidian directly, requested that he acknowledge receipt, and reproduced the detailed July 31 conference request. On August 3, 2026, I served by mail a letter that again reproduced the request. The letter and proof of service are Exhibit 5, and the direct email is Exhibit 7. Davidian never responded or participated in the requested conference.

10. On September 11, 2026, I mailed to the courtroom deputy blank subpoenas for issuance to Wells Fargo, Nationstar Mortgage LLC DBA Mr. Cooper, and Swift Financial. On September 16, 2026, I received the issued subpoenas. When completed and served, they will seek bank records concerning the March 2019 transfers and destination accounts, mortgage-payment

and principal-balance histories relevant to tracing funds into the Property, and records concerning the Swift financing and related bank accounts. I expect to complete the subpoenas and send them for service no later than Wednesday, September 23, 2026.

11. In the early afternoon of September 17, 2026, I emailed counsel for Swift Financial and asked whether he would provide the Wells Fargo records Swift had obtained under subpoena. A few minutes later, I emailed Gorginian again and stated: "Despite your statement below, I never saw any Wells Fargo statements. That's why I just sent the message I sent to Mr. Schlechter [*sic*]." That follow-up message is also included in Exhibit 6.

12. As of the date of this declaration, neither Gorginian nor Swift's counsel has responded to my September 17 messages, and no one has provided me with the referenced Wells Fargo statements. Davidian never responded to either my July 31 conference request or my August 1 direct follow-up, and never participated in the requested conference. No supplemental or corrected discovery responses or additional documents were provided in response to that request.

13. The subpoenaed records are important to trace whether and to what extent financing proceeds increased or preserved equity in the Property, to test Davidian's account of the March 2019 transactions, and to prepare dispositive motions. Service, production, review, and any necessary follow-up cannot reasonably be completed before November 20, 2026.

14. I am contemporaneously filing the separate Discovery Motion. I seek no discovery relief or sanction through the present motion. The discovery history is presented to explain my diligence, the timing of the proposed amendment, and the need for a workable schedule. I

have sought amendment and schedule modification diligently and not for purposes of delay. I intend to preserve every previously stated claim under §§ 523 and 727. My present emphasis on the § 523 and Property-related claims does not abandon any § 727 claim.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on September 21, 2026 at Hemet, California.

Gregg Roberts

Gregg Roberts

Plaintiff, Assignee of Record and Judgment Creditor, Pro Se

**EXHIBIT LIST**

Exhibit 1: Proposed Second Amended Complaint.

Exhibit 2: Full Redline Comparison of First Amended Complaint and Proposed Second Amended Complaint.

Exhibit 3: Roberts' November 7, 2025 objection to claimed homestead exemption.

Exhibit 4: Roberts' Requests for Admission, Interrogatories, and Requests for Production, followed by Davidian's complete combined purported responses, excluding documents produced with the responses.

Exhibit 5: Roberts' August 1, 2026 letter to Davidian reproducing the July 31, 2026 discovery-conferral request, together with the August 3, 2026 proof of service by mail.

Exhibit 6: July 31, 2026 email from Sevan Gorginian disclaiming representation of Davidian in the adversary proceeding and expressly stating that he would send Wells Fargo statements previously provided to Swift Financial, together with Roberts' September 17, 2026 follow-up stating that the promised statements had not been received.

Exhibit 7: August 1, 2026 direct follow-up email from Roberts to Davidian requesting acknowledgment of receipt and reproducing Roberts' detailed July 31, 2026 discovery-conferral request under LBR 7026-1(c).

# Exhibit 1

Gregg Roberts
43430 E Florida Ave F-293
Hemet CA 92544
951-350-5371
gregg@legalsupport-sc.com
Assignee of Record and Judgment Creditor, Pro Se

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re Armen Davidian,<br><br>Debtor<br><br>GREGG ROBERTS,<br><br>Assignee of Record and Judgment Creditor,<br><br>v.<br><br>ARMEN DAVIDIAN; NARINE STEPANYAN; and SANDRA McBETH, solely in her official capacity as Chapter 7 Trustee,<br><br>Defendants. | AP Case #1:25-ap-01080-MB<br>Chapter 7<br>Main Case #1:25-bk-11688-MB<br><br>**[PROPOSED] SECOND AMENDED COMPLAINT FOR:**<br><br>**(1) NONDISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(2)(A);**<br>**(2) NONDISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(6);**<br>**(3) REDUCTION OF HOMESTEAD EXEMPTION UNDER 11 U.S.C. § 522(o);**<br>**(4) CONSTRUCTIVE-TRUST RELIEF UNDER CALIFORNIA LAW AND DETERMINATION OF THE ESTATE'S INTEREST UNDER 11 U.S.C. § 541(d);**<br>**(5) EQUITABLE-LIEN RELIEF UNDER CALIFORNIA LAW;**<br>**(6) DETERMINATION OF VALIDITY, AMOUNT, PRIORITY, AND EXTENT OF DEED-OF-TRUST LIEN AND CANCELLATION TO THE EXTENT PROVEN INVALID; AND**<br>**(7–9) DENIAL OF DISCHARGE UNDER 11 U.S.C. §§ 727(a)(3), (a)(5), AND (a)(4)(A)**<br><br>Judge: Hon. Martin Barash |

## I. NATURE OF THE ACTION

1. Plaintiff Gregg Roberts seeks a determination that the debt represented by an assigned December 10, 2019 judgment against Debtor Armen Davidian is nondischargeable because Davidian obtained the underlying money through fraud and, in part, through willful and malicious injury.

2. Roberts also seeks the statutory reduction of Davidian's claimed homestead exemption to the extent proved under 11 U.S.C. § 522(o).

3. In separate and alternative property claims, Roberts seeks a constructive-trust remedy, an equitable lien, and a determination under 11 U.S.C. § 541(d) to the extent fraudulently obtained money or identifiable substitutes are proved to have increased or preserved equity in Davidian's California residence.

4. Roberts further seeks adjudication of the enforceable obligation, if any, underlying a deed of trust that Davidian executed and recorded in March 2019 in favor of Narine Stepanyan; the lien's validity, amount, and extent; and the relative priority of any property interest established under Claims Four or Five.

5. Finally, Roberts seeks denial of Davidian's discharge under 11 U.S.C. §§ 727(a)(3), (a)(5), and (a)(4)(A).

6. Roberts does not assert a claim under 11 U.S.C. §§ 510(c), 544, or 548.

## II. JURISDICTION, CORE STATUS, VENUE, AND AUTHORITY

7. The United States District Court has subject-matter jurisdiction under 28 U.S.C. § 1334. This proceeding has been referred to the Bankruptcy Court under 28 U.S.C. § 157(a) and General Order 13-05 of the United States District Court for the Central District of California.

8. The § 523 claims are core proceedings under 28 U.S.C. § 157(b)(2)(I), and the § 727 claims are core proceedings under § 157(b)(2)(J).

9. The exemption claim concerns allowance of an exemption and administration of the estate under 28 U.S.C. § 157(b)(2)(A) and (B).

10. The claim determining the deed-of-trust lien's validity and extent, and its relative priority to any property interest established under Claims Four or Five, is a core proceeding under 28 U.S.C. § 157(b)(2)(K) and an adversary proceeding under Federal Rule of Bankruptcy Procedure 7001(b). The related controversy over the existence and amount of the obligation, if any, secured by that lien is addressed as declaratory relief.

11. The constructive-trust and equitable-lien claims seek determinations of interests in property and equitable relief under Federal Rules of Bankruptcy Procedure 7001(b) and (g). They fall at least within related-to jurisdiction under 28 U.S.C. § 1334(b) because their resolution may alter property of the estate, the claimed exemption, and the value available to creditors.

12. To the extent any claim is noncore, or the Bankruptcy Court otherwise lacks constitutional authority to enter final judgment without consent, Roberts does not consent to entry of final judgment and requests that the Bankruptcy Court submit proposed findings of fact and conclusions of law to the District Court under 28 U.S.C. § 157(c)(1).

13. Venue is proper under 28 U.S.C. § 1409(a).

14. Declaratory relief related to the lien, property-interest, and equitable-relief proceedings pleaded here is procedurally available under Federal Rule of Bankruptcy Procedure 7001(i) and 28 U.S.C. § 2201.

## III. PARTIES

15. Roberts is the assignee of record and current owner of all legal rights, title, and interests transferred with Retail Capital LLC's December 10, 2019 judgment against Davidian.

16. The judgment was entered in the original amount of $108,260.60, exclusive of later-accruing interest and recoverable enforcement amounts.

17. Roberts is also the holder of the resulting judgment-lien interest in the real property described below and is the real party in interest on the assigned claims pleaded here.

18. Davidian is the debtor in Chapter 7 Case No. 1:25-bk-11688-MB and resides at the Property defined below.

19. Stepanyan is identified as both trustee and beneficiary in Los Angeles County Instrument No. 2019-0251159.

20. This action does not presume that Stepanyan has personally asserted any position in this litigation. She is joined because the action seeks adjudication of the apparent or purported interest in the Property evidenced by that recorded instrument.

21. Sandra McBeth is the appointed Chapter 7 Trustee.

22. McBeth is joined solely in her official representative capacity on the property-related claims because those claims may determine whether value is property of the estate, remove value from the estate, encumber estate property, or enlarge equity available to the estate.

23. Roberts alleges no personal misconduct by McBeth and seeks no damages or other personal relief against her.

24. McBeth filed a Report of No Distribution on October 9, 2025 and a certification of services on November 5, 2025.

25. The bankruptcy case has not been closed, and Roberts has identified no separate abandonment notice or order under 11 U.S.C. § 554 and Federal Rule of Bankruptcy Procedure 6007.

## IV. FACTUAL ALLEGATIONS

### *A. Davidian's March 2019 Representations and the Retail Capital Transaction*

26. In early March 2019, Davidian sought business financing from Retail Capital for GS Custom Bar & Furniture, his sole proprietorship.

27. On or about March 4, 2019, Davidian completed a Business Funding Prequalification Request.

28. Item E asked whether the applicant had existing business funding. Davidian answered "No."

29. The form represented that the supplied information was true, correct, and complete.

30. On March 5, 2019, Retail Capital conducted and recorded a pre-funding verification interview with Davidian.

31. Davidian stated that he had no existing merchant cash advances and had never had a similar daily or weekly product. Certified Transcript 4:1–10.

32. Davidian confirmed that he understood that "taking any additional funding during the term of the loan would be considered an event of default." Id. 4:11–15.

33. Davidian said he intended to use the money immediately for additional employees, supplies, contracts, and payroll. Id. 4:24–5:20.

34. Davidian said he was comfortable supporting the weekly repayment schedule. Id. 5:16–20.

35. Davidian confirmed that all information he had supplied orally and in writing was complete, accurate, and contained no material misrepresentations. Id. 8:9–13.

36. Immediately after that confirmation, Retail Capital's representative stated that the funds could be released that day. Davidian selected wire delivery. Id. 8:14–24.

37. On March 5, 2019, Davidian electronically signed Business Loan and Security Agreement No. 347116 (the "Agreement").

38. The Agreement provided a principal amount of $75,600 and a total repayment amount of $100,548.

39. The Agreement became effective no later than March 6, 2019, when the lender transmitted the principal amount.

40. Section 3 restricted use of the principal to specified business purposes and prohibited a distribution to an owner.

41. Section 10.7 represented and warranted that all financial and other information supplied in connection with the Agreement was true, accurate, and complete in all respects, and acknowledged the lender's reliance on that information.

42. Section 8.1(e) made a materially false or misleading representation, warranty, or statement an Event of Default.

43. Section 8.1(i) made failure to perform any covenant or agreement an Event of Default.

44. Section 9 granted a security interest in, among other property, Davidian's present and after-acquired deposit accounts, instruments, and proceeds.

45. Section 20 prohibited unauthorized dispositions of collateral and required proceeds of an unauthorized disposition to be held in trust and delivered immediately to the lender.

46. Section 21 prohibited financing arrangements that required or contemplated regular payments more frequently than monthly.

47. Section 8.2 provided secured-creditor remedies upon an Event of Default.

48. The Agreement selected Arizona law broadly for claims arising from or relating to the Agreement, subject to controlling federal bankruptcy law and law governing interests in California real property.

49. Davidian also signed a Weekly Repayment Addendum on March 5, 2019.

50. The Addendum changed the required payment to $1,523.50 weekly and amended § 8.1(a) so that one unsuccessful weekly debit constituted an Event of Default.

51. On March 6, 2019, Retail Capital wired net proceeds of $73,710 to Davidian's Bank of America business account ending in 1868 (the "Designated Account").

*B. The Concurrent Financing and the Misleading Half-Truth*

52. The Designated Account received a $50,000 WebBank wire at 12:29 p.m. Eastern time on March 6, 2019, approximately thirty-five minutes after the Retail Capital wire.

53. The Designated Account also received a $34,500 online credit advance on March 6 and a $38,204 Millennium Trust Company wire on March 8.

54. On information and belief, before Retail Capital funded, Davidian had applied for, negotiated, arranged, or reached a concrete plan to obtain the financing that produced at least the same-day WebBank credit, including financing associated with Swift Financial and WebBank.

55. The factual basis for that inference includes the near-simultaneous $50,000 WebBank wire, the ordinary time required to apply for and approve commercial financing, and Davidian's acknowledgment the preceding day that additional funding during the Retail loan term would constitute an Event of Default.

56. Roberts does not allege that a merely pending application, standing alone, made the answer "No" to "existing business funding" literally false.

57. The actionable deception is that Davidian supplied a partial account of his financing, warranted that his account was complete, acknowledged the materiality of additional funding, promised compliance with the Agreement, and omitted the concurrent application, arrangement, or concrete plan that was peculiarly within his knowledge.

58. That combination conveyed that no undisclosed financing transaction was poised to close during the Retail loan term and that Davidian then intended to comply with the financing restrictions.

59. On information and belief, Davidian knew that implication was false when made and intended Retail Capital to fund before learning the complete facts.

60. Retail Capital would not have funded on the same terms had Davidian disclosed the concurrent financing activity, the concrete plan to obtain additional funding during the term, and his actual intended disposition of the collateral and proceeds.

61. Retail Capital justifiably relied on Davidian's representations, warranty of completeness, omissions, promises, and recorded confirmations.

*C. Rapid Depletion of the Designated Account*

62. The Designated Account began March 2019 with a balance of $110,075.72.

63. During March it received credits totaling $196,783.48, including the Retail Capital, WebBank, online-advance, and Millennium Trust funds.

64. Seventeen large round-number checks totaling $276,070 were dated from March 1 through March 13 and cleared from March 1 through March 14.

65. Two of those checks, totaling $25,000, were dated and cleared March 1, before the Agreement.

66. The remaining checks, totaling $251,070, were dated March 6 through March 13 and cleared March 6 through March 14.

67. Four checks totaling $97,770 cleared on March 6, the day Retail Capital and WebBank funded.

68. Among the seventeen checks were a $10,000 check payable to Davidian, a $15,000 check payable to GS Custom Bar & Furniture before the Agreement, and a $35,000 check payable to GS Custom Bar & Furniture on March 6.

69. On information and belief, the checks payable to Davidian or his DBA were deposited into an account at Wells Fargo that Davidian controlled. Roberts is seeking the third-party records necessary to confirm the destination and subsequent use.

70. Checks to NB Transportation and Fly Venture Corporation totaled $78,170.

71. Fly Venture Corporation's public filing described its business as a limousine service.

72. Davidian has suggested that he made furniture for limousines. That explanation would make a limousine operator a possible customer paying Davidian; it does not explain why Davidian's furniture business paid $78,170 to transportation-associated entities.

73. Davidian has produced no invoice, contract, purchase order, receipt, work order, or contemporaneous ledger showing what those transportation-associated entities supplied in exchange for the payments.

74. The payment direction is not a technical curiosity. It runs opposite to Davidian's explanation and leaves $78,170 of rapid, round-number disbursements without a documented business purpose.

75. On March 14, 2019, Davidian made the first $1,523.50 payment to Retail Capital.

76. On March 15, after a $365.68 credit, Davidian withdrew $28,805.30 in cash and reduced the Designated Account balance to zero.

77. Retail Capital's next weekly debit, on March 21, was returned for insufficient funds.

78. Under the Weekly Repayment Addendum, the March 21 unsuccessful debit was an Event of Default under § 8.1(a).

79. Davidian did not cure and made no further payments.

80. All of the identified checks cleared, and the final cash withdrawal occurred, before the March 21 payment default.

81. Roberts therefore does not allege that those transactions followed the March 21 payment default.

82. Roberts alleges instead that, if the omissions and warranty of completeness described above are proved materially false or misleading, an Event of Default under § 8.1(e) existed no later than the Agreement's effective date.

83. Roberts further alleges that each proven violation of the use, collateral, account, or prohibited-financing covenants constituted a separate Event of Default under § 8.1(i) when it occurred.

84. The rapid sequence—concurrent funding, $251,070 in post-Agreement checks, a cash withdrawal that reduced the account to zero, and failure after one payment—supports an inference of a preexisting plan rather than an unforeseen later inability to perform.

*D. Davidian's Later Explanation*

85. On December 23, 2025, Davidian signed a declaration under penalty of perjury in support of his opposition to Roberts's homestead-exemption objection.

86. Davidian stated that his business stopped during the pandemic, client orders dried up, and he practically lost the business.

87. In context, Davidian used that later pandemic collapse as part of his explanation for why he could not repay Retail Capital.

88. Davidian did not literally state that COVID-19 caused the March 2019 default.

89. But his account omitted that payment failure began in March 2019, approximately one year before California's pandemic restrictions, after the Designated Account had been reduced to zero and after only one Retail payment.

90. Davidian also declared that Bank of America informed him that the business account would be closed, that he wrote the final checks to vendors, that the account was closed the next month, and that Retail's money was used in the business and paid to vendors.

91. The bank records show that the immediate disbursements included checks payable to Davidian and his own DBA, $78,170 to transportation-associated entities, and the $28,805.30 cash withdrawal.

92. Monthly statements for April and May 2019 continued to identify the same account, each with a zero balance and no transactions.

93. Those facts do not by themselves prove every ultimate use of the money. They do show that Davidian's description was incomplete and that downstream bank and mortgage records are necessary to test it.

*E. The Property, Homestead Exemption, and Tracing*

94. The real property at issue is commonly known as 8517 Marklein Avenue, North Hills, California 91343, together with the legal description in Los Angeles County Instrument No. 2019-0251159 (the "Property").

95. Davidian claims a homestead exemption in the Property.

96. Roberts timely objected to the claimed exemption on November 7, 2025 in the main bankruptcy case.

97. The objection expressly invoked 11 U.S.C. § 522(o), alleged that fraudulently obtained or otherwise nonexempt value had been directed into the homestead during the statutory ten-year period with the required intent, and requested coordination with this adversary proceeding.

98. The exemption objection remains pending.

99. The Court has calendared proceedings concerning the objection concurrently with status proceedings in this adversary case. Roberts does not allege that the presently located written orders independently adjudicated the objection or formally consolidated it into this action.

100. On information and belief, during the ten years before the September 12, 2025 petition date, Davidian disposed of nonexempt property with intent to hinder, delay, or defraud one or more creditors and used some of that value to increase his interest in the Property.

101. The possible mechanisms include payment of mortgage principal and capital improvements that increased the Property's value.

102. Roberts also alleges, as a fact-dependent causation theory rather than a settled rule of tracing, that fraudulently obtained funds may have paid other obligations in an integrated transaction that freed otherwise available income for contemporaneous mortgage-principal payments or capital improvements.

103. Roberts is in the process of subpoenaing historical mortgage-servicing, Wells Fargo, and other third-party records to determine whether, when, and in what amount those events occurred.

104. Any § 522(o) reduction sought will be limited to the value of Davidian's interest in the Property actually proved attributable to a qualifying disposition.

105. Mortgage principal reduction may increase equity by the amount of principal paid. Expenditures for improvements will be measured by value actually added, not automatically by their cost.

106. Roberts does not seek to treat ordinary interest, taxes, insurance, utilities, or maintenance as an automatic increase in homestead value.

*F. The Stepanyan Deed of Trust*

107. Davidian signed a deed of trust that states it was made on March 13, 2019.

108. Davidian's signature was acknowledged by a notary on March 12, 2019.

109. Davidian caused the instrument to be recorded on March 21, 2019 as Los Angeles County Instrument No. 2019-0251159 (the "Stepanyan Deed of Trust").

110. The Stepanyan Deed of Trust names Stepanyan as both trustee and beneficiary. Stepanyan did not sign it.

111. The Stepanyan Deed of Trust recites that it secures a separate promissory note "of even date" in the principal amount of $300,000, plus qualifying later advances.

112. The Stepanyan Deed of Trust does not itself show what amount Stepanyan actually advanced, what remained owing on March 21, 2019, or what remains owing now.

113. No copy of the recited promissory note has been produced to Roberts.

114. No accounting, advance schedule, repayment history, maturity date, interest rate, installment schedule, bank record, cancelled check, receipt, tax record, or communication substantiating the $300,000 amount has been produced to Roberts.

115. In written discovery responses that were served without Davidian's signature, Davidian stated that Stepanyan supplied mostly cash and some checks from approximately 2009 through 2012.

116. Davidian stated that he could not repay her and therefore decided years later to give her a lien because she otherwise might sue him.

117. That account, if credited, does not establish that no debt existed.

118. It does raise concrete questions about how undocumented transfers made seven to ten years earlier were fixed at exactly $300,000, whether a note "of even date" was actually executed, what terms governed the obligation, and what amount remained enforceable when the deed was recorded and when the petition was filed.

119. Davidian's bankruptcy Schedule D lists the Stepanyan claim in an "Unknown" amount, describes it as a "Disputed Lien (Complaint for Quiet Title)" recorded March 21, 2019, and marks the claim disputed.

120. The same Schedule D lists Retail Capital's $108,260.60 judgment lien against the Property as recorded in April 2025.

121. Roberts's assigned judgment-lien interest is directly affected because any amount validly secured by the earlier-recorded Stepanyan Deed of Trust reduces the equity available to satisfy Roberts's judgment.

122. The First Amended Complaint placed Davidian on notice that the enforceability and effect of the Stepanyan Deed of Trust were disputed, but did not join Stepanyan.

123. Roberts reasonably expected Davidian to produce the note and records that would establish the obligation's existence and amount and support the lien's validity and extent.

124. If those records had resolved the issue in Stepanyan's favor, the Court could have left her interest undisturbed without adjudicating relief against her.

125. Davidian's response that he has no such records makes Stepanyan's participation necessary so she has a fair opportunity to produce any note, accounting, or payment evidence she possesses before the apparent interest evidenced by the deed is adjudicated.

126. The recorded deed's recital of a contemporaneous $300,000 note did not disclose that Davidian would later say the alleged advances were undocumented cash and occasional checks from 2009 through 2012.

127. Roberts acquired the judgment and judgment-lien interest in 2025 and learned through the bankruptcy schedules and ensuing investigation that Davidian himself treated the Stepanyan lien and amount as disputed.

128. Roberts did not discover, and through reasonable diligence could not have discovered, the alleged absence of the recited note and supporting records until Davidian supplied his 2026 discovery account and production.

129. To the extent the Sixth Claim seeks relief on the ground of fraud or mistake, the relevant facts are pleaded as having been discovered within the three years preceding this amendment for purposes of California Code of Civil Procedure § 338(d). Roberts does not allege that § 338(d) governs every theory or remedy pleaded in that claim.

130. Alternatively, this controversy over the obligation's existence and amount, the Stepanyan lien's validity and extent, and its effect on Roberts's enforcement rights became concrete when Roberts recorded his judgment lien and Davidian placed the Property, exemption, and disputed Stepanyan lien before this Court.

131. Roberts does not allege, without evidence, that Stepanyan participated in fraud or inequitable conduct.

132. Roberts does not seek avoidance of the Stepanyan Deed of Trust under 11 U.S.C. §§ 544 or 548.

**FIRST CLAIM FOR RELIEF**

**Nondischargeability Under 11 U.S.C. § 523(a)(2)(A)**

*Against Davidian*

133. Roberts incorporates paragraphs 1 through 93 as though fully set forth here.

134. Davidian obtained Retail Capital's money through false pretenses, false promises, a materially misleading half-truth, and fraudulent omissions concerning his concurrent financing activity, concrete plan for additional funding, intended use and disposition of proceeds, and then-present intent to comply with the Agreement.

135. When Davidian spoke about existing funding, acknowledged the prohibition and default consequence, promised compliance, and warranted that his information was complete, he had a duty to disclose the additional facts necessary to make that partial account not misleading. See *Apte v. Japra (In re Apte)*, 96 F.3d 1319, 1323–24 (9th Cir. 1996).

136. The omission itself is not a "statement respecting financial condition." Roberts does not rely under § 523(a)(2)(A) on Item E alone as an affirmatively false written financial-condition statement. See *Oregon v. Mcharo (In re Mcharo)*, 611 B.R. 657, 661–62 (B.A.P. 9th Cir. 2020).

137. Davidian knew the omitted facts and the falsity of his promise or present intention, and intended to deceive Retail Capital.

138. Intent is supported by the near-simultaneous other funding, Davidian's recorded acknowledgment, the Agreement's completeness warranty, the rapid post-funding disbursements, the cash withdrawal that reduced the Designated Account to zero, and failure after one payment.

139. Retail Capital justifiably relied on Davidian's representations, promises, warranty, omissions, and recorded confirmations in funding the loan.

140. The deception proximately caused Retail Capital's loss and the debt reduced to the December 10, 2019 judgment.

141. Because the assignments transferred Retail Capital's rights, Roberts may pursue the assigned nondischargeability claim based on Retail Capital's reliance. See *Boyajian v. New Falls Corp. (In re Boyajian)*, 564 F.3d 1088, 1091–93 (9th Cir. 2009).

142. The assigned judgment debt and all ancillary liability traceable to the fraud are nondischargeable under § 523(a)(2)(A). See *Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998).

## SECOND CLAIM FOR RELIEF

**Nondischargeability Under 11 U.S.C. § 523(a)(6) Based on Conversion**

*Against Davidian*

143. Roberts incorporates paragraphs 1 through 93 and 133 through 142 as though fully set forth here.

144. Arizona law governs the primary conversion theory under the Agreement's choice-of-law clause. California conversion is pleaded in the alternative under Federal Rule of Civil Procedure 8(d), incorporated by Federal Rule of Bankruptcy Procedure 7008.

145. The Agreement's security grant attached and was enforceable against Davidian as to the collateral in which he had rights, including deposit accounts, instruments, and identifiable proceeds. See Ariz. Rev. Stat. § 47-9203(A)–(B).

146. Roberts does not allege that filing the UCC financing statement perfected a security interest in the Designated Account as original collateral, or that Retail Capital had control of that account. See Ariz. Rev. Stat. §§ 47-9312(B)(1), 47-9314(A)–(B), and 47-9104.

147. This count does not depend on a claim that Bank of America was obligated to honor instructions from Retail Capital under Arizona Revised Statutes § 47-9607(A)(4) or (5).

148. It concerns Davidian's own post-default dominion over identifiable cash, instruments, and traceable proceeds in violation of the Agreement's collateral restrictions and § 20 duty to hold proceeds of unauthorized dispositions in trust and deliver them immediately.

149. If the fraud and materially incomplete warranty alleged in the First Claim are proved, an Event of Default under Agreement § 8.1(e) existed no later than the Effective Date.

150. Additional Events of Default occurred when Davidian violated any proven use, collateral, account, or prohibited-financing covenant.

151. The specifically challenged property includes the $35,000 March 6 instrument payable to Davidian's DBA, its traceable proceeds, the $28,805.30 cash withdrawn on March 15, and any other identifiable post-default collateral or proceeds proved through the Wells Fargo and related records.

152. Roberts does not include the two March 1 checks totaling $25,000 as post-Agreement conversions.

153. On information and belief, Davidian intentionally transferred, withdrew, retained, or redirected the specifically identifiable collateral and proceeds without Retail Capital's consent, without holding or delivering unauthorized-disposition proceeds as required, and without accounting for their ultimate use.

154. Under Arizona law, conversion requires wrongful dominion over identifiable personal property inconsistent with another's rights and an immediate right to possession. Money is actionable when it is identifiable and subject to an obligation to treat it in a specific manner. *Case Corp. v. Gehrke*, 208 Ariz. 140, 143-45 ¶¶ 11, 17-24, 91 P.3d 362, 365-67 (Ct. App. 2004).

155. The Agreement's default remedies, collateral restrictions, and express trust-and-delivery obligation supplied Retail Capital's immediate rights in the identifiable property and proceeds pleaded here.

156. Alternatively, if California law governs, the same facts establish wrongful dominion over specifically identifiable property inconsistent with Retail Capital's ownership or immediate possessory rights, causing damage. See *Farmers Insurance Exchange v. Zerin*, 53 Cal. App. 4th 445, 451–52 (1997).

157. Davidian's conduct was not merely a failure to pay. It was the intentional exercise of dominion over the specified collateral and proceeds after obtaining the loan through the alleged preconceived deception and while knowing that stripping those assets would injure Retail Capital's contractual and secured rights.

158. Davidian acted with the subjective purpose of causing that injury or actual knowledge that injury was substantially certain. The conduct was wrongful, intentional, necessarily caused injury, and lacked just cause or excuse. See Carrillo v. Su (In re Su), 290 F.3d 1140, 1144–47 (9th Cir. 2002).

159. Roberts acknowledges that conversion is not automatically willful and malicious and that contract breach alone is insufficient. See Peklar v. Ikerd (In re Peklar), 260 F.3d 1035, 1037–39 (9th Cir. 2001); Lockerby v. Sierra, 535 F.3d 1038, 1040–42 (9th Cir. 2008).

160. The portion of the assigned debt proved to have resulted from the willful and malicious conversion is nondischargeable under § 523(a)(6). Roberts does not allege that the entire judgment is automatically nondischargeable under this subsection.

**THIRD CLAIM FOR RELIEF**

**Reduction of Homestead Exemption Under 11 U.S.C. § 522(o)**

*Against Davidian*

161. Roberts incorporates paragraphs 1 through 106 and 133 through 142 as though fully set forth here.

162. During the ten years before the petition date, Davidian disposed of property that was nonexempt.

163. Davidian made one or more such dispositions with actual intent to hinder, delay, or defraud a creditor.

164. On information and belief, some portion of the value disposed of was used to increase the value of Davidian's interest in the Property, including through mortgage-principal reduction or capital improvements.

165. The amount of the increase attributable to a qualifying disposition remains unliquidated pending the third-party bank, mortgage-servicing, and property records.

166. Under § 522(o), Davidian's claimed homestead exemption must be reduced only to the extent of the increase actually proved attributable to each qualifying disposition.

167. Roberts does not seek an equitable surcharge untethered to a Bankruptcy Code provision. See Law v. Siegel, 571 U.S. 415, 421, 425–27 (2014).

168. Roberts raised this theory expressly and timely in his November 7, 2025 exemption objection.

## VIII. FOURTH CLAIM FOR RELIEF

### Constructive-Trust Relief Under California Law and Determination of the Estate's Interest Under 11 U.S.C. § 541(d)

*Against Davidian and McBeth Solely in Her Official Capacity*

169. Roberts incorporates paragraphs 1 through 142 and 161 through 168 as though fully set forth here.

170. This claim is pleaded separately from, and in the alternative to, the equitable-lien claim below.

171. California Civil Code §§ 2223 and 2224 recognize an involuntary trust where a person wrongfully gains or detains specific property to which another is entitled. A constructive trust requires an identifiable res, Roberts's right to that res, and Davidian's wrongful acquisition or detention of it. See *Communist Party v. 522 Valencia, Inc.*, 35 Cal. App. 4th 980, 990-91 (1995).

172. The alleged fraud supplies the underlying wrong. The constructive trust is the requested proprietary remedy, not a freestanding tort.

173. Roberts owns Retail Capital's assigned proprietary rights arising from that wrong.

174. The 2019 judgment fixed Davidian's personal liability. It did not adjudicate beneficial ownership of any specific value later proved traceable into the Property or the effect of that interest under § 541(d) upon the 2025 bankruptcy filing.

175. On information and belief, some money obtained through the fraud, or an identifiable substitute for that money, is directly and strictly traceable into mortgage-principal reduction or capital improvements that increased the Property's value.

176. Roberts bears the burden to identify and strictly trace that value. See *Mitsui Manufacturers Bank v. Unicom Computer Corp. (In re Advent Management Corp.)*, 104 F.3d 293, 295–96 (9th Cir. 1997).

177. Roberts does not allege that the "freed-up funds" theory, without traditional tracing to an identifiable res or substitute, satisfies constructive-trust tracing.

178. The amount, if any, is unliquidated pending third-party records.

179. To the extent a constructive-trust interest is established under applicable nonbankruptcy law, 11 U.S.C. § 541(d) limits the estate to the title and interest Davidian held at filing.

180. Section 541(d) supplies the bankruptcy consequence of the proven state-law interest; it is not pleaded as an independent cause of action.

181. California law is pleaded because the requested remedy concerns beneficial value in California real property. If the Agreement's Arizona choice-of-law clause governs the antecedent restitutionary question, Roberts pleads materially corresponding Arizona restitution and constructive-trust principles in the alternative.

182. The Court should determine the strictly traceable value, if any, recognize the corresponding constructive-trust interest, and determine the resulting estate interest under § 541(d), without double recovery.

## IX. FIFTH CLAIM FOR RELIEF

**Equitable-Lien Relief Under California Law**

*Against Davidian and McBeth Solely in Her Official Capacity*

183. Roberts incorporates paragraphs 1 through 142 and 161 through 181 as though fully set forth here.

184. This claim is pleaded in the alternative to constructive-trust relief.

185. An equitable lien is a charge against specific property securing payment of an obligation. It would leave the Property in the estate subject to that charge rather than establish Roberts's beneficial ownership of the Property under § 541(d). See *Farmers Insurance Exchange v. Zerin*, 53 Cal. App. 4th 445, 453–54 (1997).

186. On information and belief, fraudulently obtained money, identifiable substitutes, or value causally attributable to those funds directly reduced mortgage principal or paid for capital improvements that increased the Property's value.

187. To the extent proved, permitting Davidian to retain that specific increase while invoking the homestead against the victim and assignee of the underlying fraud would unjustly enrich him at Roberts's expense.

188. The Agreement did not identify the Property as collateral. Roberts therefore does not seek an equitable lien based merely on the unpaid debt or a bare promise to pay.

189. Roberts seeks a lien only to the extent a specific causal and equitable nexus is proved between the wrongful acquisition of funds and value added to the Property.

190. The integrated use of fraudulently obtained funds to pay other obligations may be circumstantial evidence of that causal nexus if it is proved to have freed contemporaneous funds actually applied to mortgage principal or capital improvements. Roberts does not present indirect economic benefit alone as conclusive tracing.

191. California law is pleaded because the requested lien would encumber California real property. If the Agreement's Arizona choice-of-law clause governs the antecedent restitutionary question, Roberts pleads materially corresponding Arizona equitable-lien and restitution principles in the alternative.

192. The Court should impose an equitable lien only in the amount proved and should prevent duplication with relief under § 522(o) or the constructive-trust theory.

## X. SIXTH CLAIM FOR RELIEF

**Determination of Validity, Amount, Priority, and Extent of Stepanyan Deed-of-Trust Lien; Cancellation to the Extent Proven Invalid**

*Against Davidian, Stepanyan, and McBeth Solely in Her Official Capacity*

193. Roberts incorporates paragraphs 1 through 25 and 94 through 132 as though fully set forth here.

194. Under California law, a deed of trust is security for an underlying obligation and cannot secure more than the enforceable obligation it supports. See Alliance Mortgage Co. v. Rothwell, 10 Cal. 4th 1226, 1235–36 (1995).

195. The Stepanyan Deed's reference to a $300,000 note is evidence to be considered. It does not conclusively establish that $300,000 was advanced, that a separate note was executed, or that $300,000 remained owing at recording or remains owing today.

196. Davidian's signed deed may constitute a written acknowledgment or promise with legal consequences under California Code of Civil Procedure § 360. Roberts does not ask the Court to disregard that issue.

197. The enforceable effect of any acknowledgment depends on the instrument, the obligation acknowledged, and the surrounding facts, including the missing note and accounting.

198. The presently known facts support a reasonable inference that the deed may materially exceed the enforceable obligation or may secure no enforceable obligation: Davidian describes mostly cash and occasional checks from 2009 through 2012; the deed recites a note "of even date"; no note or accounting has been produced; and Davidian himself scheduled the amount as unknown and the lien as disputed.

199. Those facts do not establish the ultimate result. Stepanyan is joined so that she may produce contrary evidence and be heard before her apparent interest is adjudicated.

200. An actual controversy exists concerning the underlying obligation's existence and amount, the lien's validity and extent, and the relative priority between any property interest established under Claims Four or Five and any valid Stepanyan lien.

201. Leaving an invalid or overstated instrument of record would cloud the Property and seriously injure Roberts's enforcement rights.

202. Under California Civil Code § 3412, Roberts seeks cancellation only if the instrument is proved void or voidable as against his interests. Independently, Roberts seeks a determination limiting the lien to the amount, if any, legally secured.

203. Under Federal Rule of Bankruptcy Procedure 7001(b), Roberts seeks determination of the validity and extent of the lien purportedly imposed by Los Angeles County Instrument No. 2019-0251159 and the relative priority between any property interest established under Claims Four or Five and any valid Stepanyan lien. Under Rule 7001(i) and 28 U.S.C. § 2201, Roberts seeks related declaratory relief determining the existence and present amount of the enforceable obligation, if any, secured by that lien.

204. If the evidence proves a valid obligation in an amount less than $300,000, the lien should be limited to the amount legally secured.

205. If the evidence proves no enforceable obligation, the instrument should be cancelled and the lien reduced by 100 percent.

206. If the evidence proves the full obligation and lien valid, Roberts seeks no reduction merely because Davidian voluntarily executed the deed or because Stepanyan did not sign it.

207. Roberts does not seek equitable subordination under 11 U.S.C. § 510(c) or priority for his later judgment lien over a valid Stepanyan lien. If Claims Four or Five establish a property interest, Roberts seeks only the priority that applicable nonbankruptcy law assigns it.

208. The delayed-discovery and later-accrual facts in paragraphs 126 through 130 are incorporated as the basis for timeliness. Roberts does not rely solely on relation back under Federal Rule of Civil Procedure 15(c), made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7015.

## XI. SEVENTH CLAIM FOR RELIEF

### Denial of Discharge Under 11 U.S.C. § 727(a)(3)

*Against Davidian*

209. Roberts incorporates paragraphs 1 through 132 as though fully set forth here.

210. Davidian failed to keep or preserve recorded information from which his financial condition and material business transactions might be ascertained.

211. Missing records include invoices, contracts, receipts, purchase orders, work orders, contemporaneous ledgers, source-and-use records, and downstream account records for the substantial March 2019 credits, the $251,070 in post-Agreement checks, the $28,805.30 cash withdrawal, and the transportation-associated payments.

212. The bank statements and check images identify immediate transfers. They do not show the economic purpose, ultimate recipient, resulting asset, or subsequent disposition of the money.

213. Missing records also include the note, advance records, accounting, and payment history for the presently asserted Stepanyan obligation and deed of trust.

214. The Stepanyan records concern a current $300,000 recorded encumbrance and are not rendered immaterial merely because Davidian says the underlying transfers occurred years earlier.

215. Davidian operated a business, obtained and moved substantial commercial funds, and entered multiple financing transactions. The magnitude and complexity of those transactions required more than unsupported recollection.

216. Retail Capital filed suit in August 2019. That pending and ensuing litigation gave Davidian an additional reason to preserve records concerning the transaction and disposition of funds.

217. Davidian has stated that older records were discarded, but has not supplied a transaction-specific justification adequate to permit his financial condition and business dealings to be ascertained.

218. The absence of the records prevents Roberts, the Trustee, and the Court from determining what assets were acquired, whether value remains in the Property or elsewhere, what obligation supports the Stepanyan Deed, and whether Davidian's sworn explanations are accurate.

219. Under all the circumstances, Davidian's failure to keep or preserve adequate records is not justified. His discharge should be denied under § 727(a)(3). See *Caneva v. Sun Communities Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 761–63 (9th Cir. 2008).

## XII. EIGHTH CLAIM FOR RELIEF

**Denial of Discharge Under 11 U.S.C. § 727(a)(5)**

*Against Davidian*

220. Roberts incorporates paragraphs 1 through 132 as though fully set forth here.

221. Davidian possessed substantial assets in March 2019, including the $73,710 Retail Capital wire, the same-period $50,000 WebBank wire, $34,500 online advance, $38,204 Millennium Trust wire, and the preexisting Designated Account balance.

222. Within days, the Designated Account was reduced to zero through $276,070 in checks, other debits, and the $28,805.30 cash withdrawal.

223. To the extent Davidian used those funds for employees, supplies, contracts, payroll, inventory, equipment, or other business assets as represented, the resulting assets or their proceeds are also assets whose later loss or deficiency requires a satisfactory explanation.

224. Davidian's business continued for years after March 2019. His bankruptcy schedules state that GS Custom Bar & Furniture stopped operating in 2022 and list only small equipment and tools of modest value.

225. Davidian's general explanation that the money was paid to vendors, followed by a later pandemic business collapse, does not explain transaction by transaction what was acquired, what happened to the acquired value, why funds went to himself, his DBA, transportation-associated entities, and cash, or whether any value was transferred into the Property or another account.

226. The age of the 2019 transactions is a circumstance to consider, but the transactions remain connected to Davidian's 2025 financial condition because they allegedly funded a business that continued until 2022, may have produced assets or proceeds, and bear directly on his present Property and exemption claims.

227. For the reasons pleaded in paragraphs 221 through 226, Roberts alleges that Davidian once owned identifiable assets not too remote from the petition date, no longer owned those assets at filing, and has not satisfactorily explained their loss or deficiency. His discharge

should be denied under § 727(a)(5). See *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1205 (9th Cir. 2010).

## XIII. NINTH CLAIM FOR RELIEF

**Denial of Discharge Under 11 U.S.C. § 727(a)(4)(A)**

*Against Davidian*

228. Roberts incorporates paragraphs 1 through 132 as though fully set forth here.

229. On Official Form 101, Part 3, question 12, filed September 12, 2025, Davidian answered "No" when asked whether he was a sole proprietor of any full- or part-time business.

230. In the Statement of Financial Affairs signed under penalty of perjury on September 5, 2025 and filed with the petition, Davidian identified "Uber / Turo Car Rental" as a business existing from January 1, 2021 "to Current" and described himself as an Uber/Lyft driver and Turo rental business.

231. His Schedule I attachment likewise identified him as an Uber driver, and his expense schedule described "DBA Expenses (Uber Driver: Gas $900 / $100 Parking / Maintenance)."

232. Davidian personally knew whether he was then operating a sole-proprietor Uber/Turo business. The "No" answer and the contemporaneous "to Current" business disclosure cannot both provide a complete and accurate account without further explanation.

233. The discrepancy was material because it bore directly on current business activity, income, expenses, assets, records, and the Trustee's ability to investigate the estate.

234. On December 23, 2025, Davidian also submitted the declaration described in paragraphs 85 through 93 under penalty of perjury to defeat Roberts's exemption objection.

235. In that declaration, Davidian presented the money as having been used in the business and paid to vendors, while omitting the checks to himself and his DBA, the $78,170 paid to transportation-associated entities, the $28,805.30 cash withdrawal, the account's reduction to zero before the second debit, and the fact that nonpayment began in March 2019 rather than during the pandemic.

236. Davidian knew the immediate payees, the cash withdrawal, and the timing of his own first and failed second payment.

237. In the context in which the declaration was offered, those omissions made the account materially misleading concerning the disposition of assets, the claimed exemption, and the asserted innocent explanation for nonpayment.

238. The pleaded oaths and omissions were made knowingly and fraudulently. Davidian's reckless indifference to the truth, considered with the surrounding facts and pattern of omission, supports the inference of actual fraudulent intent; recklessness is not alleged as a substitute for that intent. See *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1198–99 (9th Cir. 2010).

239. The matters were material because they related to Davidian's business dealings, income, disposition of substantial assets, estate property, and claimed exemption.

240. Davidian's discharge should be denied under § 727(a)(4)(A). See Retz v. Samson (In re Retz), 606 F.3d 1189, 1196–99 (9th Cir. 2010).

241. No current discharge exists. Roberts does not presently seek revocation under 11 U.S.C. § 727(d)(1), and does not waive any revocation claim that may later arise if a discharge is entered and the requirements and time limits of 11 U.S.C. § 727(d) and (e) are satisfied.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Roberts requests judgment:

A. Declaring the assigned judgment debt, postjudgment interest, and all ancillary liability traceable to the fraud nondischargeable under 11 U.S.C. § 523(a)(2)(A);

B. Declaring the portion of the assigned debt proved to have resulted from willful and malicious conversion nondischargeable under 11 U.S.C. § 523(a)(6);

C. Reducing Davidian's homestead exemption under 11 U.S.C. § 522(o) only to the extent of the increase in value of his interest in the Property proved attributable to each qualifying disposition;

D. Determining the identifiable value, if any, strictly traceable into the Property; recognizing an appropriate constructive-trust interest under applicable nonbankruptcy law; and determining the estate's resulting interest under 11 U.S.C. § 541(d);

E. Alternatively, imposing an equitable lien on the Property only in the amount proved causally connected to fraudulently obtained funds or identifiable substitutes, without duplicative recovery;

F. Determining the existence and amount of any enforceable obligation owed to Stepanyan; the validity and extent of the lien, if any, purportedly imposed by Los Angeles County

Instrument No. 2019-0251159; and the relative priority between any property interest established under Claims Four or Five and any valid Stepanyan lien;

G. Reducing the amount of that lien to the extent it is proved invalid, up to 100 percent of the amount of the lien; limiting the lien to the amount, if any, legally secured; and, if the instrument is proved void or voidable as against Roberts, cancelling it under California Civil Code § 3412;

H. Denying Davidian a discharge under 11 U.S.C. §§ 727(a)(3), (a)(5), and/or (a)(4)(A);

I. Awarding Roberts allowable costs and all attorneys' fees and expenses actually incurred and recoverable under Agreement § 10.13 and applicable law;

J. Providing that no relief is awarded personally against Trustee McBeth and that her participation is solely in her official representative capacity; and

K. Granting such other and further relief as the Court deems just and proper, without double recovery.

Dated: September 21, 2026.

Respectfully submitted,

Gregg Roberts

______________________________

Gregg Roberts

Plaintiff, Assignee of Record and Judgment Creditor, Pro Se

# Exhibit 2

Gregg Roberts
43430 E Florida Ave F-293
Hemet CA 92544
951-~~330-4450~~350-5371
gregg@legalsupport-sc.com
Assignee of Record and Judgment Creditor, Pro Se

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SAN FERNANDO VALLEY DIVISION**

In re Armen Davidian,

Debtor

Gregg RobertsGREGG ROBERTS,

Assignee of Record and Judgment Creditor,

v.

Armen Davidian,

Debtor / DefendantARMEN DAVIDIAN; NARINE STEPANYAN; and SANDRA McBETH, solely in her official capacity as Chapter 7 Trustee,

Defendants.

AP Case #1:25-ap-01080-MB
Chapter 7
Main Case #1:25-bk-11688-MB

Chapter 7

Adv. No. #1:25-ap-01080-MB

**FIRST[PROPOSED] SECOND AMENDED COMPLAINT FOR:**

**(1.) NONDISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(2)(A);**
**(2) NONDISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(6);**
**(3) REDUCTION OF DEBT FOR FRAUD; 2. WILLFUL AND MALICIOUS INJURY; 3.HOMESTEAD EXEMPTION UNDER 11 U.S.C. § 522(o);**
**(4) CONSTRUCTIVE-TRUST; 4. REVOCATION RELIEF UNDER CALIFORNIA LAW AND DETERMINATION OF THE ESTATE'S INTEREST UNDER 11 U.S.C. § 541(d);**
**(5) EQUITABLE-LIEN RELIEF UNDER CALIFORNIA LAW;**
**(6) DETERMINATION OF VALIDITY, AMOUNT, PRIORITY, AND EXTENT OF DEED-OF-TRUST LIEN AND CANCELLATION TO THE EXTENT PROVEN INVALID; AND**
**(7–9) DENIAL OF DISCHARGE FOR FAILURE TO PRESERVE RECORDS; 5. REVOCATION OF DISCHARGE FOR FAILURE TO EXPLAIN LOSS OF ASSETS; AND 6. REVOCATION OF DISCHARGE FOR FALSE OATHS OR ACCOUNTSUNDER 11 U.S.C. §§ 727(a)(3), (a)(5), AND (a)(4)(A)**

Judge: Hon. Martin Barash

I. JURISDICTION AND VENUE

This adversary proceeding is brought under 11 U.S.C. §§ 523(

## I. NATURE OF THE ACTION

1. Plaintiff Gregg Roberts seeks a)(2)(A) and 523(a)(6) to determine determination that the nondischargeability of a debt arising fromrepresented by an assigned December 10, 2019 judgment against Debtor Armen Davidian is nondischargeable because Davidian obtained the underlying money through fraud and, in part, through willful and malicious injury.

2. Roberts also seeks the statutory reduction of Davidian's claimed homestead exemption to the extent proved under 11 U.S.C. § 522(o).

3. In separate and alternative property claims, Roberts seeks a constructive-trust remedy, an equitable lien, and a determination under 11 U.S.C. § 541(d) to the extent fraudulently obtained money or identifiable substitutes are proved to have increased or preserved equity in Davidian's California residence.

4. Roberts further seeks adjudication of the enforceable obligation, if any, underlying a deed of trust that Davidian executed and recorded in March 2019 in favor of Narine Stepanyan; the lien's validity, amount, and extent; and the relative priority of any property interest established under Claims Four or Five.

~~1.~~5. Finally, Roberts seeks denial of Davidian's discharge under 11 U.S.C. §§ 727(a)(3), (a)(5), and (a)(4~~), and (a)(5) to determine whether discharge should be revoked for, respectively, failing to preserve records, making false oaths or accounts, and failing to satisfactorily explain loss of assets to meet the debtor's liabilities.~~)(A).

6. Roberts does not assert a claim under 11 U.S.C. §§ 510(c), 544, or 548.

## II. JURISDICTION, CORE STATUS, VENUE, AND AUTHORITY

7. The United States District Court has subject-matter jurisdiction under 28 U.S.C. ~~§§~~§ 1334. This proceeding has been referred to the Bankruptcy Court under 28 U.S.C. § 157(a) and General Order 13-05 of the United States District Court for the Central District of California.

~~2.~~8. The § 523 claims are core proceedings under 28 U.S.C. § 157(b)(2)(I), and the § 727 claims are core proceedings under § 157(b)(2)(~~I) and 1334(b~~J).

3. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

9. The exemption claim concerns allowance of an exemption and administration of the estate under 28 U.S.C. § 157(b)(2)(A) and (B).

10. The claim determining the deed-of-trust lien's validity and extent, and its relative priority to any property interest established under Claims Four or Five, is a core proceeding under 28 U.S.C. § 157(b)(2)(K) and an adversary proceeding under Federal Rule of Bankruptcy Procedure 7001(b). The related controversy over the existence and amount of the obligation, if any, secured by that lien is addressed as declaratory relief.

11. The constructive-trust and equitable-lien claims seek determinations of interests in property and equitable relief under Federal Rules of Bankruptcy Procedure 7001(b) and (g). They fall at least within related-to jurisdiction under 28 U.S.C. § 1334(b) because their resolution may alter property of the estate, the claimed exemption, and the value available to creditors.

12. To the extent any claim is noncore, or the Bankruptcy Court otherwise lacks constitutional authority to enter final judgment without consent, Roberts does not consent to entry of final judgment and requests that the Bankruptcy Court submit proposed findings of fact and conclusions of law to the District Court under 28 U.S.C. § 157(c)(1).

4.13. Venue is proper under 28 U.S.C. § 1409(a).

14. Declaratory relief related to the lien, property-interest, and equitable-relief proceedings pleaded here is procedurally available under Federal Rule of Bankruptcy Procedure 7001(i) and 28 U.S.C. § 2201.

## III. PARTIES

5. Roberts does not consent to entry of final judgment by the Bankruptcy Court.

6. Defendant's Answer was allegedly served on December 29, 2025, although the envelope in which it arrived was postmarked January 6, 2026. Plaintiff's 21-day amendment period for filing as a matter of right under Rule 15(a)(1)(B), plus three additional days under Rule 6(d), expires on January 22, 2026. Accordingly, this First Amended Complaint is timely filed.

## II.I. THE PARTIES

7. Plaintiff Gregg Roberts is the Assigneeassignee of Recordrecord and current owner of the state-courtall legal rights, title, and interests transferred with Retail Capital LLC's December 10, 2019 judgment against Defendant.

8.15. Defendant Armen Davidian ("Davidian") is the debtor in the above-captioned Chapter 7 case filed in this Court.

16. **GENERAL** The judgment was entered in the original amount of $108,260.60, exclusive of later-accruing interest and recoverable enforcement amounts.

17. Roberts is also the holder of the resulting judgment-lien interest in the real property described below and is the real party in interest on the assigned claims pleaded here.

18. Davidian is the debtor in Chapter 7 Case No. 1:25-bk-11688-MB and resides at the Property defined below.

19. Stepanyan is identified as both trustee and beneficiary in Los Angeles County Instrument No. 2019-0251159.

20. This action does not presume that Stepanyan has personally asserted any position in this litigation. She is joined because the action seeks adjudication of the apparent or purported interest in the Property evidenced by that recorded instrument.

21. Sandra McBeth is the appointed Chapter 7 Trustee.

22. McBeth is joined solely in her official representative capacity on the property-related claims because those claims may determine whether value is property of the estate, remove value from the estate, encumber estate property, or enlarge equity available to the estate.

23. Roberts alleges no personal misconduct by McBeth and seeks no damages or other personal relief against her.

24. McBeth filed a Report of No Distribution on October 9, 2025 and a certification of services on November 5, 2025.

25. The bankruptcy case has not been closed, and Roberts has identified no separate abandonment notice or order under 11 U.S.C. § 554 and Federal Rule of Bankruptcy Procedure 6007.

## ~~III.~~IV. FACTUAL ALLEGATIONS

### *~~A. The~~ A. Davidian's March 2019 Representations and the Retail Capital ~~Loan and Davidian's Immediate Default~~Transaction*

~~9.~~26. ~~Prior to the bankruptcy filing, in~~In early March 2019, Davidian ~~obtained~~sought business financing from Retail Capital~~. He made only the first payment~~ for GS Custom Bar & Furniture, his sole proprietorship.

~~10. Davidian's purported second payment was returned for insufficient funds~~On or ~~account closure.~~

~~11. Davidian never made good on the second payment and never made any additional payments.~~

~~*B. Suspicious Withdrawals: $276,070 in Round-Number Checks, Leaving the Account at Zero*~~

~~12.~~27. ~~In~~about March 4, 2019, Davidian ~~wrote~~completed a ~~series of large checks drawn in round numbers and made other substantial withdrawals, totaling $276,070.00, leaving his bank account balance at precisely zero~~Business Funding Prequalification Request.

~~13. The pattern of withdrawals is inconsistent with ordinary business expenditures. Legitimate payroll, vendor, or contractor payments seldom consist of repeatedly rounded-off sums.~~

14. In conferral through counsel, Davidian admitted to not having kept or preserved invoices from the alleged vendors to whom the above-described checks were written.

15. The timing of the withdrawals – immediately after receiving substantial funds and making only one repayment installment – demonstrates an intention to remove the funds from reach of the lender and avoid repayment from the outset.

28. An honestItem E asked whether the applicant had existing business person intending to repayfunding. Davidian answered "No."

29. The form represented that the supplied information was true, correct, and complete.

30. On March 5, 2019, Retail Capital conducted and recorded a pre-funding verification interview with Davidian.

31. Davidian stated that he had no existing merchant cash advances and had never had a similar daily or weekly product. Certified Transcript 4:1–10.

32. Davidian confirmed that he understood that "taking any additional funding during the term of the loan would preserve sufficient reserves to service the debt for more be considered an event of default." Id. 4:11–15.

33. Davidian said he intended to use the money immediately for additional employees, supplies, contracts, and payroll. Id. 4:24–5:20.

34. Davidian said he was comfortable supporting the weekly repayment schedule. Id. 5:16–20.

35. Davidian confirmed that all information he had supplied orally and in writing was complete, accurate, and contained no material misrepresentations. Id. 8:9–13.

36. Immediately after that confirmation, Retail Capital's representative stated that the funds could be released that day. Davidian selected wire delivery. Id. 8:14–24.

37. On March 5, 2019, Davidian electronically signed Business Loan and Security Agreement No. 347116 (the "Agreement").

38. The Agreement provided a principal amount of $75,600 and a total repayment amount of $100,548.

~~16.~~39. The Agreement became effective no later than ~~a single month~~March 6, 2019, when the lender transmitted the principal amount.

~~17. Several of the aforementioned checks were made payable to businesses whose names indicate no connection to Davidian's then-current furniture business.~~

40. ~~Instead, at least two of the payees' of those checks appear to be in the transportation business, specifically~~Section 3 restricted use of the principal to specified business purposes and prohibited a distribution to an owner.

41. Section 10.7 represented and warranted that all financial and other information supplied in connection with the Agreement was true, accurate, and complete in all respects, and acknowledged the lender's reliance on that information.

42. Section 8.1(e) made a materially false or misleading representation, warranty, or statement an Event of Default.

43. Section 8.1(i) made failure to perform any covenant or agreement an Event of Default.

44. Section 9 granted a security interest in, among other property, Davidian's present and after-acquired deposit accounts, instruments, and proceeds.

45. Section 20 prohibited unauthorized dispositions of collateral and required proceeds of an unauthorized disposition to be held in trust and delivered immediately to the lender.

46. Section 21 prohibited financing arrangements that required or contemplated regular payments more frequently than monthly.

47. Section 8.2 provided secured-creditor remedies upon an Event of Default.

48. The Agreement selected Arizona law broadly for claims arising from or relating to the Agreement, subject to controlling federal bankruptcy law and law governing interests in California real property.

49. Davidian also signed a Weekly Repayment Addendum on March 5, 2019.

50. The Addendum changed the required payment to $1,523.50 weekly and amended § 8.1(a) so that one unsuccessful weekly debit constituted an Event of Default.

51. On March 6, 2019, Retail Capital wired net proceeds of $73,710 to Davidian's Bank of America business account ending in 1868 (the "Designated Account").

*B. The Concurrent Financing and the Misleading Half-Truth*

52. The Designated Account received a $50,000 WebBank wire at 12:29 p.m. Eastern time on March 6, 2019, approximately thirty-five minutes after the Retail Capital wire.

53. The Designated Account also received a $34,500 online credit advance on March 6 and a $38,204 Millennium Trust Company wire on March 8.

54. On information and belief, before Retail Capital funded, Davidian had applied for, negotiated, arranged, or reached a concrete plan to obtain the financing that produced at least the same-day WebBank credit, including financing associated with Swift Financial and WebBank.

55. The factual basis for that inference includes the near-simultaneous $50,000 WebBank wire, the ordinary time required to apply for and approve commercial financing, and Davidian's acknowledgment the preceding day that additional funding during the Retail loan term would constitute an Event of Default.

56. Roberts does not allege that a merely pending application, standing alone, made the answer "No" to "existing business funding" literally false.

57. The actionable deception is that Davidian supplied a partial account of his financing, warranted that his account was complete, acknowledged the materiality of additional funding, promised compliance with the Agreement, and omitted the concurrent application, arrangement, or concrete plan that was peculiarly within his knowledge.

58. That combination conveyed that no undisclosed financing transaction was poised to close during the Retail loan term and that Davidian then intended to comply with the financing restrictions.

59. On information and belief, Davidian knew that implication was false when made and intended Retail Capital to fund before learning the complete facts.

60. Retail Capital would not have funded on the same terms had Davidian disclosed the concurrent financing activity, the concrete plan to obtain additional funding during the term, and his actual intended disposition of the collateral and proceeds.

61. Retail Capital justifiably relied on Davidian's representations, warranty of completeness, omissions, promises, and recorded confirmations.

*C. Rapid Depletion of the Designated Account*

62. The Designated Account began March 2019 with a balance of $110,075.72.

63. During March it received credits totaling $196,783.48, including the Retail Capital, WebBank, online-advance, and Millennium Trust funds.

64. Seventeen large round-number checks totaling $276,070 were dated from March 1 through March 13 and cleared from March 1 through March 14.

65. Two of those checks, totaling $25,000, were dated and cleared March 1, before the Agreement.

66. The remaining checks, totaling $251,070, were dated March 6 through March 13 and cleared March 6 through March 14.

67. Four checks totaling $97,770 cleared on March 6, the day Retail Capital and WebBank funded.

68. Among the seventeen checks were a $10,000 check payable to Davidian, a $15,000 check payable to GS Custom Bar & Furniture before the Agreement, and a $35,000 check payable to GS Custom Bar & Furniture on March 6.

69. On information and belief, the checks payable to Davidian or his DBA were deposited into an account at Wells Fargo that Davidian controlled. Roberts is seeking the third-party records necessary to confirm the destination and subsequent use.

~~18.~~70. Checks to NB Transportation and Fly Venture Corporation~~. The May 2015 California Secretary of State Statement of Information of that latter business describes its "type of business" as "limousine service".~~ totaled $78,170.

71. In his Original Petition, DE #Fly Venture Corporation's public filing described its business as a limousine service.

72. Davidian has suggested that he made furniture for limousines. That explanation would make a limousine operator a possible customer paying Davidian; it does not explain why Davidian's furniture business paid $78,170 to transportation-associated entities.

73. Davidian has produced no invoice, contract, purchase order, receipt, work order, or contemporaneous ledger showing what those transportation-associated entities supplied in exchange for the payments.

74. The payment direction is not a technical curiosity. It runs opposite to Davidian's explanation and leaves $78,170 of rapid, round-number disbursements without a documented business purpose.

75. On March 14, 2019, Davidian made the first $1, p. 40, Davidian stated 523.50 payment to Retail Capital.

76. On March 15, after a $365.68 credit, Davidian withdrew $28,805.30 in cash and reduced the Designated Account balance to zero.

77. Retail Capital's next weekly debit, on March 21, was returned for insufficient funds.

78. Under the Weekly Repayment Addendum, the March 21 unsuccessful debit was an Event of Default under § 8.1(a).

79. Davidian did not cure and made no further payments.

80. All of the identified checks cleared, and the final cash withdrawal occurred, before the March 21 payment default.

81. Roberts therefore does not allege that those transactions followed the March 21 payment default.

82. Roberts alleges instead that, if the omissions and warranty of completeness described above are proved materially false or misleading, an Event of Default under § 8.1(e) existed no later than the Agreement's effective date.

83. Roberts further alleges that each proven violation of the use, collateral, account, or prohibited-financing covenants constituted a separate Event of Default under § 8.1(i) when it occurred.

84. The rapid sequence—concurrent funding, $251,070 in post-Agreement checks, a cash withdrawal that reduced the account to zero, and failure after one payment—supports an inference of a preexisting plan rather than an unforeseen later inability to perform.

*D. Davidian's Later Explanation*

85. On December 23, 2025, Davidian signed a declaration under penalty of perjury ~~that he is employed as an Uber driver and~~ in support of his opposition to Roberts's homestead-exemption objection.

86. Davidian stated that his business stopped during the pandemic, client orders dried up, and he practically lost the business.

87. In context, Davidian used that later pandemic collapse as part of his explanation for why he could not repay Retail Capital.

88. Davidian did not literally state that COVID-19 caused the March 2019 default.

89. But his account omitted that payment failure began in March 2019, approximately one year before California's pandemic restrictions, after the Designated Account had been reduced to zero and after only one Retail payment.

90. Davidian also declared that Bank of America informed him that the business account would be closed, that he wrote the final checks to vendors, that the account was closed the next month, and that Retail's money was used in the business and paid to vendors.

91. The bank records show that the immediate disbursements included checks payable to Davidian and his own DBA, $78,170 to transportation-associated entities, and the $28,805.30 cash withdrawal.

92. Monthly statements for April and May 2019 continued to identify the same account, each with a zero balance and no transactions.